```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY


                               :
ROBERT REILLY,                 :
                               :
          Plaintiff,           :     HONORABLE JOSEPH E. IRENAS
                               :     CIVIL ACTION NO. 03-5975 (JEI)
     v.                        :
                               :
CITY OF ATLANTIC CITY;         :             OPINION
ROBERT FLIPPING; JOSEPH        :
MCCULLOUGH; and ARTHUR         :
SNELLBAKER,                    :
                               :
          Defendants.          :
```

**APPEARANCES:**

BARRY, CORRADO, GRASSI & GIBSON, P.C.
By:  FRANK L. CORRADO, Esq.
     JOSEPH C. GRASSI, Esq.
2700 Pacific Avenue
Wildwood, NJ 08260
     Counsel for Plaintiff Robert Reilly

BARKER, DOUGLASS & SCOTT, P.C.
By:  A. MICHAEL BARKER, Esq.
Linwood Greene-Suite 12
210 New Road
Linwood, NJ 08221
     Counsel for Defendants Robert Flipping and Joseph McCullough

ZELLER & BRYANT LLP
By: Eric J. Riso, Esq.
Woodcrest Pavillion
10 Melrose Avenue, Suite 400
Cherry Hill, New Jersey 08003
     Counsel for Defendant Arthur Snellbaker

DeCOTIIS, FITZPATRICK, COLE & WISLER, LLP
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, New Jersey 07666
     Counsel for Defendant City of Atlantic City

**IRENAS**, Senior District Judge:

Plaintiff Robert Reilly ("Reilly") brings this suit against his former employer and supervisors for alleged employment retaliation.  Presently before the Court are the Defendants' Motions for Summary Judgment.

### I.

In June, 2003, Reilly retired from the Atlantic City Police Department as a Sergeant.  Reilly retired pursuant to a "Consent Agreement" between Reilly and his employer, Defendant City of Atlantic City ("Atlantic City" or "the City"), which allowed Reilly to retire with his full pension instead of facing disciplinary sanctions-- including a 90-day suspension, a reduction in rank to patrolman, and removal from the promotion list-- resulting from an investigation into sexual harassment charges made by a female police officer against Reilly.  (Defs. Ex. O)[1]  Reilly asserts that this adverse employment action was taken against him because of his involvement several years earlier in an investigation of alleged misconduct by Defendant Robert Flipping ("Flipping").

Between 1989 and 1991 Reilly was a detective in the

---

[1]  Defendants Flipping and McCullough have submitted exhibits in support of their Motion for Summary Judgment which the other Defendants also rely upon.  Therefore, we will refer to the Exhibits attached to the Flipping / McCullough motion as "Defs. Ex."  Other exhibits will be separately referenced where necessary.

"investigation unit" of the Atlantic City Police Department. During this time, Reilly was assigned to an investigation that eventually led to the trial of Patrolman Dennis Munoz ("Munoz") in 1993 on criminal charges of official misconduct, promoting prostitution, and accepting bribes.[2]  Flipping was Munoz's supervisor and close friend at the time of the alleged crimes and testified on Munoz's behalf at the trial.  Reilly testified at the Munoz trial on behalf of the prosecution.[3]  (Defs. Ex. E at p. 100)

Flipping was never charged or disciplined in connection with the events surrounding the Munoz trial.[4]  Flipping knew that he was a target in the Munoz investigation, however, and he specifically knew that the state prosecutor had questioned witnesses about Flipping before the Munoz grand jury.  (Pls. Ex. P at p. 174-76)  A local newspaper covering the Munoz trial also reported that "Flipping was one of the state's prime targets in its investigation . . . and could still face charges once the Munoz case is decided, both sides in the trial have indicated."

---

[2]  The outcome of the trial is not apparent from the record.

[3]  Reilly had established a professional relationship with an informant who cooperated in the investigation.

[4]  Indeed, it appears from the record that Flipping was promoted to captain in the year following the Munoz trial, and Flipping has earned subsequent promotions since that time.

(Pls. Ex. R)[5]

In September, 2002, Flipping was promoted to Director of Public Safety.[6]  While the record is unclear whether the Public Safety Director has the final authority to make promotion decisions or disciplinary decisions, it is clear that Flipping, as Public Safety Director, had a leading role in the decision in Reilly's case.  Police officer Timothy Friel ("Friel")[7] testified at his deposition that based on his knowledge of the events surrounding the Munoz trial and conversations with Flipping around the time Flipping became Public Safety Director, Friel believed that Flipping wanted to prevent Reilly's promotion. (Pls. Ex. B) Specifically, Friel stated,

> So there was a dislike, and Flipping being very
> close-- very, very close with Munoz for his whole
> career, in my opinion, was very pissed off about it
> and really, really disliked [Reilly] because of
> that. . . . It was my opinion that when Flipping
> became the director of public safety and had some
> say as to whether it was going to be promotions or
> not, it was his first true opportunity to get even
> with Reilly for that investigation with Dennis
> Munoz.

(Pls. Ex. B at 26-27)

---

[5]  Reilly also apparently participated in other more minor investigations involving Flipping, including a drug investigation involving Flipping's father's funeral parlor and an investigation into irregularities in Flipping's time cards.  However, no charges or disciplinary actions were ever taken against Flipping, and Reilly has produced no evidence that Flipping knew about these other investigations.  (Defs. Ex. E at p. 109, 113)

[6]  Flipping eventually stepped down from his director position in March or April, 2004, for reasons unrelated to the present suit.  (Pls. Ex. D at 41)

[7]  Friel was next in line for a promotion after Reilly.

4

According to Reilly, Flipping's opportunity came in February, 2003, when an independent hearing officer found that Reilly had violated Atlantic City Police Department Rules and Regulations prohibiting sexual harassment.[8]  Though not entirely clear in the record, it appears that Reilly's hearing was conducted pursuant to the "major discipline" procedure for civil service employees set out in the New Jersey Administrative Code. *See* N.J. Admin. Code § 4A:2-2.5 - 2.6; *see generally* N.J. Admin. Code §§ 4A:2-1.1 - 4A:2-6.2.  Thus, a "designated representative," in this case, Hearing Officer Willis Flower, Esq., presided over the hearing, where both Atlantic City and Reilly were represented by counsel. *See* N.J. Admin. Code § 4A:2-2.6(a)-(b).

In a 28-page opinion, Hearing Officer Flower thoroughly summarized what took place at the hearing, including the testimony of the complaining officer, Reilly, and at least eleven other witnesses.  (Defs. Ex. I)  Hearing Officer Flower made findings of fact and conclusions of law after having considered briefs submitted by both sides.  (Id.)  Specifically, Hearing Officer Flower found that Reilly "made derogatory comments involving women" in the complainant's presence which "embarrassed

---

[8]  The finding was based on events and charges that pre-dated Officer Flipping's promotion to Director of Public Safety.

and intimidated" her.[9]  (Id. at 10-11)  He also found that Reilly had engaged in other conduct that, while not necessarily sexual in nature, "contributed to a hostile work environment that intimidated, derided and belittled" the complainant.  (Id. at 11)  These findings notwithstanding, Hearing Officer Flower also found that Reilly had not intended to intimidate the complainant.  (Id. at 21)  He then recommended: "In my judgment, dismissal, reduction in rank or lengthy suspension is not called for here. . . . My recommendation for appropriate discipline is a four day suspension without pay."  (Id.)

Shortly after receiving the opinion, Defendant Police Chief Arthur Snellbaker ("Snellbaker") discussed it with Flipping, his immediate supervisor, who also received the opinion.  Snellbaker expressed "consternation" over the opinion and asked Flipping whether he was required to follow the disciplinary recommendation, which Snellbaker considered "unacceptable." (Pls. Ex. D at 48-50)  Flipping stated that he believed that Snellbaker was responsible for enforcing the department rules and regulations, and indicated that Flipping would await Snellbaker's recommendation.[10]  (Id.)

---

[9]   The complainant testified that the derogatory comments were never specifically directed towards her.  Instead, Reilly made comments about women's anatomy in general.  (Defs. Ex. I at 3)

[10]   Flipping and Snellbaker may have discussed whether Flowers had authority to make a disciplinary recommendation at all, but the record is not entirely clear on this point.

Accordingly, on February 24, 2003, Snellbaker drafted a memorandum to Flipping in which he quoted Hearing Officer Flower's recommendation but made his own recommendation that Reilly should be reduced in rank.  (Defs. Ex. J)  He based this recommendation on his view that Reilly's conduct was "egregious and reprehensible" especially because it was directed towards "the most impressionable of his subordinates."  (Id.)  Snellbaker explained, "[t]he essence of leadership is dignity.  No one will willingly follow a clown or 'one of the boys' into harm's way."[11] (Id.)

After receiving Snellbaker's recommendation, Flipping reviewed Reilly's disciplinary history and drafted his own memorandum to the department's business administrator recommending that Reilly be removed from the promotion list for his negative "prior employment history."   (Defs. Ex. L) Flipping wrote, "While it is clear that almost fifteen years have passed since Reilly's last disciplinary incident [not including the recent sexual harassment case], it should be noted that he has had assignments during that period that removed him from the day to day type of public contact.  Reilly was placed in plain clothes type activities where supervision is in large measure *laissez fair*." (Id. at 2)  He continued,

---

[11]  Reilly alleges that Snellbaker disliked Reilly because of his involvement in the Munoz investigation and his close association with another officer whom Snellbaker disliked.

> Sergeant Reilly has exhibited behavior throughout
> his career that indicates racism, bigotry, sexism,
> lack of impartiality toward the public,
> irresponsibility, bringing the department into
> disrepute, failures to perform lawful duties from
> competent authority as directed and failures to
> treat others with respect.  The seeming 'hiatus'
> during the middle of his career should not mislead
> anyone into believing that this is a history of
> unrelated or isolated incidents or that Reilly's
> behavior has changed or improved.  Clearly the most
> recent incidents belie that argument.  For reasons
> unknown (perhaps related to previous administra-
> tions' lapse or malaise) no appropriate action was
> taken against Reilly's insidious behavior.  This
> administration must rise up and confront this
> situation and set the matter right.

(Id. at 3)

Reilly's disciplinary record, which dates back to March, 1979, has a total of eight entries, all of which are suspensions.[12] (Pls. Ex. I)  Among those eight, four were 3-day suspensions resulting from failing to honor a subpoena.  (Id.) Reilly was suspended once, in 1979, for "remarks of a racial nature" which were made in connection with a "falsified report" and poor "conduct toward the public."  (Id.)

Flipping did not review Reilly's personnel file which was maintained separately from the disciplinary records.  Reilly's personnel file contained, among other things, his most recent Employee Performance Evaluation in which his overall job performance was rated as "Exceeds Expectations," the highest of

---

[12]  It is undisputed that the longest of the eight suspensions was rescinded and should not have appeared on Reilly's record.  However, it is also undisputed that Flipping was not aware of the error.

the available ratings.  (Pls. Ex. K)  Reilly's direct supervisor further commented, "[t]he only way Sgt. Reilly's job performance could be improved is promotion." (Id.)

In a separate memorandum to the City business administrator, dated the same day as the above-quoted Flipping memorandum, Flipping recommended that Reilly's punishment should include both Flipping's recommended removal from the promotion list and Chief Snellbaker's recommended demotion.  (Defs. Ex. M)  Flipping further stated, "had prior administrators acted prudently, I believe that Reilly should have been terminated prior to this matter." (Id.)

City Solicitor Smoger and Personnel Director Upshaw reviewed Flipping's recommendations and Hearing Officer Flower's opinion. (Defs. Ex. N)  In a memorandum dated March 26, 2003, City Solicitor Smoger advised, "Personnel Director Upshaw and I concur with your assessment and finding and jointly request that you implement the appropriate procedures in this matter."  (Id.) There is no evidence in the record that either Smoger or Upshaw reviewed Reilly's disciplinary record or any other documentation other than Flipping's recommendation and Hearing Officer Flower's opinion.

Reilly asserts claims against Defendants City of Atlantic

City, Flipping, McCullough[13] and Snellbaker pursuant to 42 U.S.C.
§ 1983 for violation of his Fourteenth Amendment procedural due
process and First Amendment freedom of expression rights.[14]  He
also asserts against these Defendants claims of conspiracy to
violate his civil rights pursuant to 42 U.S.C. § 1985, common law
civil conspiracy, and retaliation in violation of New Jersey's
Conscientious Employee Protection Act, N.J.S.A. § 34:19-1 et seq.
("CEPA").[15]  Reilly seeks compensatory and punitive damages.[16]  We
have subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,
1343, and 1367.


## II.

"[S]ummary judgment is proper 'if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party

---

[13]  The parties submitted a consent order, which this Court approved on
October 31, 2005, dismissing Defendant McCullough from the case.

[14]  Flipping and Snellbaker are sued in both their official and
individual capacities.

[15]  The remaining claims asserted in the Complaint have either been
dismissed by the Court, see Reilly v. City of Atlantic, et al., No. 03-5975,
Order of June 8, 2004, or voluntarily dismissed by Reilly.

[16]  Reilly also seeks an order "directing defendants to cease any
further harassment of, or retaliation against, plaintiff for the exercise of
her [sic] constitutional rights of political participation."  (Compl. at p.
14) The Court is somewhat puzzled by this request given that Reilly retired
and does not seek reinstatement.  Reilly does not allege that he has suffered
any negative treatment since his retirement.

is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### III.

#### A.

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

We will first discuss the claims against Flipping and Snellbaker and then address the issue of Atlantic City's liability.

(1)

Reilly contends that Defendants severely increased the discipline he was to receive for the sexual harassment incident, which effectively forced his retirement, in retaliation for his participation in the Munoz investigation and trial.

The applicable First Amendment retaliation analysis is well-established in this Circuit.  "The plaintiff must first demonstrate that s/he engaged in protected activity, i.e. speech that addresses a matter of public concern.  We then employ the [*Pickering*] balancing test to determine whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting workplace efficiency and avoiding workplace disruption.  Next the plaintiff must prove that the protected activity was a substantial or motivating factor in the allegedly retaliatory action.  Thereafter, the burden shifts to the employer to demonstrate that the allegedly retaliatory action would have been taken absent the protected

conduct." *Springer v. Henry*, 435 F.3d 268, 275 (3d Cir. 2006).

Despite Defendants' assertions to the contrary, we easily find that Reilly engaged in protected conduct. In *Baldassare v. State of New Jersey,* the Third Circuit held that a law enforcement officer's internal investigation into other officers' alleged criminal wrongdoing was activity protected by the First Amendment. 250 F.3d 188, 195-97 (3d Cir. 2001). The Court explained, "[o]ur jurisprudence makes clear that an internal investigation into the alleged criminal actions of public employees falls squarely within core public speech." *Id.* at 197. Because the plaintiff officer's "investigation sought to bring to light actual or potential wrongdoing or breach of public trust by the officers he investigated," the Court held that the plaintiff's "conduct and expression in the internal investigation . . . constituted a matter of public concern." *Id.*

Thus, Reilly's participation in the internal investigation of alleged criminal wrongdoing within the Atlantic City Police Department is protected by the First Amendment. Indeed, Reilly's case is even more clear because his protected activity went beyond conducting an official internal investigation. Reilly testified at the Munoz trial. Testifying at a criminal trial is clearly protected speech. *See Pro v. Donatucci,* 81 F.3d 1283, 1291 n.4 (3d Cir. 1996) (holding that courtroom testimony "raises the speech to a level of public concern regardless of its

content."); *see also McCullough, Flipping, and Snellbaker v. City of Atlantic City et al.,* 137 F. Supp. 2d 557, 568 (D.N.J. 2001) (holding that Flipping's testimony at Munoz trial was protected speech).[17]

We also find that the balance of interests favors Reilly. *Baldasarre* is analogous on this issue as well. Weighing in favor of Reilly, "the public's interest in exposing potential wrongdoing by public employees is especially powerful." *Baldasarre*, 250 F.3d at 198.

On the other hand, Defendants here "bear a truly heavy burden" because "the more tightly the First Amendment embraces the speech, the more vigorous a showing of disruption must be made." *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005). In *Baldasarre* the Court explained, "[a]n employee who exposes corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted

---

[17] To the extent Reilly bases his retaliation claim against Snellbaker on Snellbaker's alleged dislike of another officer with whom Reilly was friends we note that such evidence without more, does not establish an actionable claim. *See Ambrose v. Township of Robinson*, 303 F.3d 488, 494-96 (3d Cir. 2002) (plaintiff-police officer's "perceived support" of another officer was not protected conduct). However, for the reasons explained above and below, Reilly's participation in the Munoz investigation and trial may serve as the basis for Snellbaker's liability, provided Reilly successfully proves the other elements of his retaliation claim at trial.

the office."  250 F.3d at 200 (internal quotations omitted).[18]
Thus, we conclude that the interest in Reilly's expression
outweighs the Defendants' interest in avoiding disruption.

    With regard to the remainder of the First Amendment
analysis, it is for the fact-finder to decide: (a) whether
Reilly's increased punishment was substantially motivated by his
participation in the Munoz case and (b) whether his increased
punishment would have occurred in the absence of his
participation.  *See Baldassarre*, 250 F.3d at 195; *McGreevy*, 413
F.3d at 365-66.  Thus our inquiry at this stage of the litigation
is limited to whether Reilly has met his burden of establishing a
*prima facie* case.  *McGreevy*, 413 F.3d at 365-66.  We hold that he
has.

    In addition to his own testimony in support of the alleged
retaliation, Reilly presents the testimony of Officer Friel, who
stated he believes, based on conversations with Flipping, that
Flipping wanted to prevent Reilly's promotion because of his
involvement in the Munoz case.  Thus, Reilly has established a
*prima facie* case against Flipping.[19]

--------

[18]   We also note that Reilly participated in the Munoz investigation
because he was assigned to the project by the Atlantic City Police Department.
Thus, we are inclined to give less weight to any resulting disruption in the
department.

[19]   Reilly repeatedly suggests that "the patent excessiveness" of
Flipping's final disciplinary recommendation "can only be explained as
retaliatory." (Pls. Br. at 11-12) While we consider Flipping's recommendation
highly relevant to, and probative of, the retaliation issue, the lone fact
that the recommendation greatly exceeded the hearing officer's recommendation
does not itself suffice to establish a *prima facie* case.

We also conclude that Reilly has established a prima facie case against Snellbaker.  Although not explicit in the record, we draw the reasonable inference that Snellbaker knew about the Munoz case and Reilly's participation in it.  The trial received more than passing media attention and Reilly has established that many people within the police department knew he was involved in the case and openly expressed their disapproval of his involvement.  Moreover, Flipping and Snellbaker had at least one conversation specifically addressing Hearing Officer Flower's disciplinary recommendation, and both men were dissatisfied with the recommendation.  Reilly contends that Flipping and Snellbaker conspired to force him into retirement.  Viewing the facts as a whole in the light most favorable to Reilly, we hold that he has put forth sufficient evidence to create a triable issue of fact with regard to Snellbaker's involvement in the alleged retaliation.

We further hold that Flipping and Snellbaker are not entitled to qualified immunity on the First Amendment claim.  "The doctrine of qualified immunity shields government officials from civil liability 'as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McGreevy*, 413 F.3d at 363 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).  "'There must be sufficient precedent at the time of the action, factually

16

similar to the plaintiff's allegations, to put the defendant on notice that his or her conduct is constitutionally prohibited.'" *McKee v. Hart*, 413 F.3d 359, 364 (3d Cir. 2006) (quoting *McLaughlin v. Watson*, 271 F.3d 566 (3d Cir. 2001)).

As discussed above, *Baldassare,* decided in 2002*,* is factually similar to Reilly's case.  Thus, a reasonable official in Flipping's or Snellbaker's position in 2003 would have understood that increasing Reilly's punishment in retaliation for his participation in the Munoz investigation and trial violated Reilly's First Amendment rights.

(2)

Reilly also asserts that Defendants deprived him of procedural due process by imposing a more severe penalty for the sexual harassment incident without providing notice and opportunity to be heard.  The issue presented is whether Reilly was afforded an appropriate level of pre-deprivation procedural due process before the decision to increase his punishment from a 4-day suspension to a 90-day suspension, a reduction in rank, and removal from the promotion list.[20]

---

[20]   For the purposes of Defendants' motions only, they concede that "as a civil servant, Plaintiff had a constitutionally protected property interest and was entitled to procedural due process prior to any disciplinary action being taken against him." (Flipping Br. at 5)(see also Snellbaker Br. at 8; Atlantic City Br. at 3)(specifically incorporating Flipping's brief by reference).

Notwithstanding Snellbaker's incorporation of Flipping's concession in his opening brief, Snellbaker attempts to dispute this point in his reply

Some procedural background is necessary to understand Reilly's procedural due process claim.  The New Jersey Administrative Code sets forth the "major discipline" procedure for civil service employees.  *See* N.J. Admin. Code § 4A:2-2.5 - 2.6; *see generally* N.J. Admin. Code §§ 4A:2-1.1 - 4A:2-6.2.  The disciplinary process is initiated by "serving" on the employee a "Preliminary Notice of Disciplinary Action" from the "appointing authority"[21] which sets forth the "charges and statement of facts supporting the charges."  § 4A:2-2.5(a).  The employee must request a "departmental hearing" on the matter within five days of receiving the Preliminary Notice or else the hearing is deemed waived.  § 4A:2-2.5(d).  The hearing, if requested, takes place

---

brief.  While we question whether Snellbaker may effectively withdraw a concession earlier made (albeit by former counsel), we hold that Reilly does have a protectable property interest in his civil service position.  *See Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1077 (3d Cir. 1997)(relying on N.J.S.A. § 40A:14-147 to conclude that a New Jersey police officer "undoubtedly had a property interest in his position.").  Moreover, to the extent that Snellbaker attempts to assert that the Court already resolved this issue in Defendants' favor when ruling upon their motion to dismiss, we note that we dismissed Reilly's *substantive* due process claim for failure to allege a protectable property interest.  Protectable property interests under the substantive and procedural due process clauses are not co-extensive.  *See Nicholas v. Penn. State Univ.*, 227 F.3d 133, 140 (3d Cir. 2000) ("not all property interests worthy of procedural due process protection are protected by the concept of substantive due process.  Rather, to state a substantive due process claim, a plaintiff must have been deprived of a particular quality of property interest.")(internal citations omitted); *see also McCullough, Flipping and Snellbaker,* 137 F. Supp. 2d at 656 (holding that Snellbaker's asserted property interest in his job was not an interest protected by the substantive due process clause).  Thus our ruling that Reilly has a property interest sufficient to support a procedural due process claim is entirely consistent with our prior ruling that he had not alleged a property interest sufficient to sustain a substantive due process claim.

[21]  The "appointing authority . . . means a person or group of persons having power of appointment or removal."  *See* N.J. Admin. Code 4A:1-1.3.  As we will discuss at some length below, it appears that the Mayor of Atlantic City or his designee is the "appointing authority" in this case.

18

before "the appointing authority or its designated representative." § 4A:2-2.6(a).  The employee is entitled to be represented by counsel and the parties "have the opportunity to review the evidence supporting the charges and present and examine witnesses." § 4A:2-2.6(b)-(c).  "Within 20 days of the hearing, or such additional time as agreed to by the parties, the appointing authority shall make a decision on the charges and furnish the employee either by personal service or certified mail with a Final Notice of Disciplinary Action." § 4A:2-2.6(d).[22] What occurred in the time between the hearing and the decision on the charges, and who made the decision, are at issue in this case.[23]

We apply the balancing test of *Mathews v. Eldridge* to determine whether the process afforded Reilly was adequate. Thus, we must weigh Reilly's "private interest that will be affected by the official action," the "risk of erroneous deprivation" of the interest through the procedures used, "the

---

[22]  An employee may appeal the Final Notice of Disciplinary Action to the Merit System Board, and a hearing on the appeal may be held pursuant to N.J. Admin. Code §§ 4A:2-2.8 - 2.9.  However, because Reilly challenges the adequacy of his *pre*-deprivation process, we need not further elaborate on the post-deprivation process that would have been available to Reilly.  *See Gilbert v. Homar*, 520 U.S. 924, 935 (1997); *Solomon v. Phila. Housing Auth.*, 143 Fed. Appx. 447, 455 (3d Cir. 2005)("we think Appellant should have been accorded the minimal pre-deprivation process of notice and opportunity to be heard. . . . Regardless of whether Appellant could have challenged the suspension through the grievance procedure after he had already been suspended does not remove all need for basic pre-deprivation *Goss* process.").

[23]  It is important to note that Reilly does not challenge the events leading up to and including the hearing itself.  Thus our inquiry is limited to the internal decision process occurring after Hearing Officer Flower's decision.

probable value of additional or substitute procedural safeguards" and the "government's interest, including the function involved and the fiscal and administrative burdens that the additional procedural requirement would entail." 424 U.S. 319, 335 (1976); *Gilbert v. Homar*, 520 U.S. 924, 931-32 (1997).

Reilly has an interest in the continuation of his pay. *See Gilbert*, 520 U.S. at 932, *Solomon v. Phila. Housing Auth.*, 143 Fed. Appx. 447, 454 (3d Cir. 2005). In determining how much weight to accord Reilly's interest we must consider the length and finality of the deprivation. *See Gilbert*, 520 U.S. at 932, *Solomon,* 143 Fed. Appx. at 454 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1976)). In *Gilbert* the Supreme Court distinguished temporary suspension without pay from termination, noting that lost income alone is "relatively insubstantial" whereas "our opinions have recognized the severity of depriving someone of the means of his livelihood." 520 U.S. at 932.

While Reilly was not entirely deprived of his livelihood, accepting his punishment would have resulted in more than just a lengthy suspension. Reilly would have been demoted and removed from the promotion list. We do not necessarily equate such action with termination, but we find his punishment is much more like termination than mere suspension. As such, we accord Reilly's interest substantial weight.

The risk of erroneous deprivation was also substantial.

20

While we do not overlook the fact that Reilly was given ample process in his disciplinary hearing before Hearing Officer Flower, Officer Flipping's recommendation (and thereby Solicitor Smoger's and Director Upshaw's decision[24]) heavily relied on Reilly's disciplinary record-- evidence that was not part of the record before Hearing Officer Flower.  (See Defs. Ex. M; Snellbaker Ex. D at 42-43)  While it appears that Reilly would have had access to his own disciplinary history upon request, he had no reason to know that he should review it.

Moreover, the risk of erroneous deprivation could have been easily ameliorated by providing notice to Reilly and some opportunity for him to rebut, correct, modify, or explain the information contained in his disciplinary record.[25]  *Cf. Solomon*, 143 Fed. Appx. at 453 ("Pre-termination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story.") (citing *Cleveland Bd. of Ed. v. Loudermill*,470 U.S. 532 (1985)).  It is undisputed that Reilly had little to no notice and no opportunity to be heard before the

---

[24]  We will separately address below whether any of these people had authority to make the final disciplinary decision.

[25]  The parties do not dispute that there was in fact a significant error in Reilly's disciplinary history.  Additionally, Reilly suggests that he would have referred the decision-makers to his personnel file which contained very positive reviews of his job performance.

final determination of his punishment.[26]  Yet it would have been relatively easy for the decision-maker or participants in the decision making process to inform Reilly or his counsel that evidence not presented at the hearing-- namely Reilly's disciplinary history-- was being considered in determining the final disciplinary decision.

The government's interest in implementing Reilly's punishment without notice and opportunity to respond was minimal. As discussed above, affording Reilly an opportunity to respond prior to the punishment decision "'would impose neither a significant administrative burden nor intolerable delays.'" *Solomon*, 143 Fed. Appx. at 454 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544 (1985)).  Additionally, Defendants do not assert, and we find no evidence in the record that circumstances required Defendants to act quickly in making their determination.[27]  *See Solomon*, 143 Fed. Appx. at 453 (citing *Gilbert*); *cf. Gilbert*, 520 U.S. at 932 ("the State has a significant interest in immediately suspending, when felony

---

[26]  Reilly's attorney, Arthur Murray, who represented him during the sexual harassment hearing, testified that Murray may have received a "courtesy call" from Flipping before Reilly received the formal notice, but we draw the reasonable inference that the courtesy call was just that-- a courtesy -- and not a meaningful opportunity to dispute the decision. (Snellbaker Ex. D at 41).

[27]  We note that the New Jersey Administrative Code contains special procedural provisions for immediate suspension without notice when an employee is determined to be "unfit for duty or is a hazard to any person if permitted to remain on the job."  N.J.A.C. § 4A:2-2.5(a)(1)-(2).  Those procedures were not employed here.

charges are filed against them, employees who occupy positions of great public trust and high public visibility.").  Thus we find that Reilly has put forth sufficient evidence of a procedural due process violation based on the theory that evidence outside the record was considered without appropriate notice or opportunity to be heard.

Moreover, we note the record is not at all clear as to who has authority to make the final disciplinary decision, and who actually made the decision in Reilly's case.  Interestingly, Defendants have divergent conclusions on the authority issue. Counsel for Snellbaker apparently ascribes disciplinary authority to Snellbaker, stating unequivocally, "the Chief of Police is required by statute to enforce the rules and regulations of his department." (See Snellbaker Br. at 8)  They cite N.J.S.A. 40A:14-118: "the chief of police . . . shall be the head of the police force and [] he shall be directly responsible to the appropriate authority for the efficiency and routine day to day operations thereof, and [] he shall, pursuant to policies established by the appropriate authority: a. Administer and enforce rules and regulations and special emergency directives for the disposition and discipline of the force and its officers and personnel."  *See also* Atlantic City Code § 52-4 (same).

On the other hand, Atlantic City contends that the "appropriate authority"-- in this case the Mayor of Atlantic City

or his designee[28]-- has the final decision making authority after a disciplinary hearing has been held.  They rely on N.J. Admin. Code § 4A:2-2.6(d), which states that "[w]ithin 20 days of the hearing, or such additional time as agreed to by the parties, the appointing authority shall make a decision on the charges and furnish the employee either by personal service or certified mail with a Final Notice of Disciplinary Action."  The Mayor or his designee is the "appointing authority."  *See* N.J. Admin. Code § 4A:1-1.3 ("'Appointing authority'" means a person or group of persons having power of appointment or removal."); Atlantic City Code § 52-1 (granting the "appropriate authority" the power to appoint police officers).

Thus, questions of fact exist as to whether the person with legal authority to make the final discipline decision was actually the person to make the decision in Reilly's case.  If Reilly is able to prove at trial that someone other than the person vested with authority to make final discipline decisions made the decision as to his discipline, he will have proven a procedural due process violation.  *See Sarteschi v. Burlein*, 508 F.2d 110, 115 n.7 (3d Cir. 1975) ("the plaintiff in the case before us claims that the state failed to follow the proper

---

[28]  "The Mayor or his/her designee shall be designated as the appropriate authority. The appropriate authority shall be responsible for the overall performance of the Division. The appropriate authority shall adopt and promulgate Rules and Regulations for the government of the Division and for the discipline of its members."  Atlantic City Code § 52-5.

procedure for dismissal.  Once a state creates the expectation of
such procedures before discharge, a procedural due process right
arises to protect that expectation.") (citing *Board of Regents v.
Roth*, 408 U.S. 564 (1972)); *cf. Drayton v. Robinson,* 719 F.2d
1214, 1219 (3d Cir. 1983) (holding that failure to strictly
adhere to procedural requirements for inmate discipline was not a
due process violation; explaining that so long as an inmate has
some notice and opportunity to be heard "and *the decision maker*
reviews the charges and then-available evidence against the
prisoner, the Due Process Clause is satisfied.") (emphasis
added).  Thus summary judgment on the issue of procedural due
process is inappropriate on this theory as well.

        However, we must still address whether Snellbaker and
Flipping are entitled to qualified immunity.  As stated above,
Flipping and Snellbaker are entitled to qualified immunity if the
constitutional right which was violated was a clearly established
right that a reasonable officer would know of.  *Solomon*, 143 Fed.
Appx. at 457.

        We hold that Snellbaker and Flipping are entitled to
qualified immunity on the first theory of liability.  *Solomon*,
the most applicable case dealing with pre-deprivation notice and
opportunity to be heard, was only decided in 2005.  Indeed, the
Third Circuit noted in that opinion that the law on pre-
suspension due process rights was not well-settled in 2001, and

we have found no factually similar case that would have been available to Flipping or Snellbaker in 2003.   Thus, we conclude that a reasonable official making a disciplinary determination would not have known that Reilly was entitled to notice and an opportunity to respond before considering departmental records outside the disciplinary hearing record.

We come to the opposite conclusion on the second theory of liability.  Flipping and Snellbaker are not entitled to qualified immunity because a reasonable official in their positions would have known that they must follow the process established by New Jersey law in making disciplinary decisions.  *See Sarteschi,* 508 F.2d at 115 n.7.  Ensuring that the decision maker vested with authority to impose discipline actually makes the disciplinary decision is an integral part of the process established by New Jersey law.

### B.

We next examine Atlantic City's liability for the alleged constitutional violations.  The issue is whether the alleged constitutional violations resulted from an official government policy or custom.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  "A municipality may be liable for the torts of its employees in one of three ways: First, the municipality will be liable if its employee acted pursuant to a formal government

policy or a standard operating procedure long accepted within the government entity; second liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy; third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes.  *McGreevy*, 413 F.3d at 367 (internal citations omitted).

Deciding municipal liability requires us to determine whether, under New Jersey law, Flipping or Snellbaker were "final policymakers" with respect to the discipline of police officers. *McGreevy*, 413 F.3d at 368.  However, as explained above, we cannot determine on this record who was the final policymaker. If either Snellbaker or Flipping were indeed final policymakers or if they were acting pursuant to a standard operating procedure, Atlantic City could be liable.  It is also possible that Atlantic City effectively ratified the actions of either Snellbaker or Flipping.  Accordingly we will deny summary judgment with respect to Atlantic City's § 1983 liability.

C.

Reilly also asserts that Defendants conspired to deprive him of his constitutional rights in violation of 42 U.S.C.

27

§ 1985(3).[29]  We will grant Defendants' motions for summary judgment on this claim.

Reilly must put forth evidence that Defendants were "motivated by a class-based invidiously discriminatory animus," and that they "conspired to deprive plaintiff of the equal protection rights of the laws or of equal privileges and immunities under the laws." *Bougher v. Univ. of Pitt.*, 882 F.2d 74, 79 (3d Cir. 1989).

Reilly asserts that the Defendants "conspired to deprive him of career opportunities all based on their political animus toward Reilly." (Pls. Br. at 16)  However, Reilly fails to allege or put forth any evidence that Reilly was a member of a larger group or class.  Indeed, Reilly's entire complaint is premised on the allegation that Flipping and Snellbaker disliked Reilly personally for actions that he himself took, not for his membership or participation in any larger group.  The Third Circuit has recently made clear, "a § 1985(3) claimant must allege some racial, or perhaps otherwise class-based, invidiously

---

[29]  Section 1985(3) provides for civil liability for conspiracies to interfere with civil rights, stating "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

discriminatory animus behind the conspirators' action in order to state a § 1985(3) claim.  Regardless of the alleged basis for discrimination, however, and whether that basis is 'invidious' or not, *the allegation of a 'class-based animus' naturally presumes that there is a specific, identifiable class against whom the defendants can have discriminated.*"  *Farber v. City of Paterson*, 440 F.3d 131, 135 (3d Cir. 2006)(internal citations omitted; emphasis added).  Because we find no evidence in the record to support a conclusion that Reilly was a member of any protected class, we will grant summary judgment to Defendants on this claim.

D.

We turn next to Reilly's common law civil conspiracy claim. Under New Jersey law Reilly must prove: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) an unlawful purpose or a lawful purpose achieved by unlawful means; and (4) special damages.  *Morganroth & Morganroth v. Norris, McLaughlin & Marcus*, 331 F.3d 406, 414 (3d Cir. 2003); *Perry v. Hon. Daniel Bernardin*, No. 04-6102, 2005 U.S. Dist. LEXIS 18115 at *19-20 (D.N.J. August 18, 2005).  The "principal element" of a civil conspiracy claim is "'an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damage.'"  *Perry*, 2005

29

U.S. Dist. LEXIS 18115 at *19.

Reilly asserts that Flipping and Snellbaker conspired with each other to effectively force Reilly's retirement.  Reilly has put forth sufficient evidence that Flipping and Snellbaker discussed Hearing Officer Flower's disciplinary recommendation and their concerns about the recommendation.  Flipping's disciplinary recommendation encompassed Snellbaker's recommendation and both recommendations greatly exceeded Hearing Officer Flower's recommendation.  From these facts we may infer, for summary judgment purposes, an agreement to injure Reilly in retaliation for his participation in the Munoz case.

Atlantic City further asserts that it may not be held liable for civil conspiracy because Flipping and Snellbaker are employees of the City and therefore cannot be held to conspire with the City.[30]  It is true that under New Jersey law, officers of governmental entities generally cannot conspire with the entity.  *Sunkett v. Misci*, 183 F. Supp. 2d 691, 722 (D.N.J. 2002) (citing *Farris v. County of Camden*, 61 F. Supp. 2d 306, 329-30 (D.N.J. 1999)); *cf. Gregory v. Chehi*, 843 F.2d 111, 118 n.4 (3d Cir. 1988) (expressing doubts whether town officers can conspire with town).  The court in *Sunkett* explained, "the rationale is simple: An abstract entity can only act through its officers, so

---

[30]   In briefing this issue both sides rely upon federal authority addressing federal causes of action.  We note that New Jersey law, not federal common law, controls with respect to Reilly's civil conspiracy claims.

that a conspiracy between the officers and the entity is like a dance with one's own shadow." *Sunkett*, 183 F. Supp. 2d at 722. However the court continued,

> [t]he exception is if the officers are acting 'outside the course and scope of their employment,' in which case they are no longer representing the employer entity. *Heffernan v. Hunter*, 189 F.3d 405, 412 (3d Cir. 1999).  The same principles suggest that officers acting within the scope of their employment cannot conspire together. If Agent A and Agent B both act together to employ power that they wield only as a result of their service to Principal A, there is, in truth, only one actor, Principal A. Thus . . . officers cannot conspire together unless they have the power to carry out the purposes of the conspiracy when acting outside the scope of their employment.

*Id.*

For the reasons explained above, the record is unclear about what authority Flipping and Snellbaker did or did not have when engaging in the challenged activities.  Because we cannot determine whether or not the individual defendants were acting within the scope of their employment, summary judgment on the civil conspiracy claim will be denied.

E.

We will also deny summary judgment on Reilly's CEPA claim. A CEPA claim requires: (1) reasonable belief that the employer's conduct violated either a law, rule, or regulation; (2) whistle-blowing activity; (3) adverse employment action; and (4) a causal connection between the whistle-blowing and adverse employment

31

action.  *Dzwonar v. McDevitt,* 177 N.J. 451 (2003); *Caver v. City of Trenton,* 420 F.3d 243, 254 (3d Cir. 2005) (quoting *Dzwonar*). Defendants assert that no adverse employment action was taken against Reilly, and alternatively, if there was adverse action, there is no causal connection between his participation in the Munoz case and the adverse action.[31]

Defendants reason that Reilly voluntarily retired, therefore he suffered no adverse employment action.  "Retaliatory action" under CEPA is defined as "discharge, suspension, or demotion of an employee or other adverse employment action taken against an employee, in the terms and conditions of employment."  N.J.S.A. § 34:19-2.  Reilly's punishment included both suspension and demotion.  The fact that he later chose retirement to avoid this punishment does not defeat his CEPA claim.

With respect to causation, Defendants contend that the passage of approximately ten years between Reilly's participation in the Munoz case and the alleged retaliatory conduct precludes a finding of causation.  While temporal proximity "may permit an inference of causation," *see Schlichtig v. Inacom Corp.,* 271 F. Supp. 2d 597, 612 (D.N.J. 2003), absence of temporal proximity will not necessarily give rise to a conclusion that no causal connection exists because, "[t]iming [is not] . . . the only

---

[31]  Defendants do not dispute the first two elements of Reilly's CEPA claim.

method[] by which a plaintiff can make out a prima facie showing of causation. . . . After all, 'it is causation, not temporal proximity . . . that is an element of the plaintiff's prima facie case.'"  *Id.* at 612-13 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)); *see also McCullough, Flipping and Snellbaker*, 137 F. Supp. 2d at 573 ("the absence of temporal proximity would not necessarily disprove the causal connection.").

"A CEPA plaintiff can prove causation by presenting either direct evidence of retaliation or circumstantial evidence that justifies an inference of retaliation." *Zaffuto v. Wal-Mart Stores, Inc.*, 130 Fed. Appx. 566, 569 (3d Cir. 2005).  "A plaintiff's circumstantial evidence of retaliation may include evidence that 'demonstrates such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-retaliatory reasons.'"  *Id.*  (quoting *Kolb v. Burns*, 320 N.J. Super. 467, 478 (App. Div. 1999)).[32]

_____

[32]  The Third Circuit noted in *Zaffuto*, "[a]s recognized by the New Jersey courts, the prima facie element of causation and the element of causation in the subsequent ultimate proof stage of the case are often factually inseparable and therefore a court may rely on evidence provided in the earlier phase in resolving the latter."  130 Fed. Appx. at 569 (citing *Donofry v. Autotote Sys., Inc.*, 350 N.J. Super. 276 (App. Div. 2001)).

We hold that Reilly has sustained his summary judgment
burden by presenting evidence that Flipping and Snellbaker's
proferred reasons for their disciplinary recommendations-- namely
the "egregiousness" of Reilly's conduct and his prior
disciplinary history-- are unworthy of credence.  A reasonable
fact finder could find Snellbaker's conclusion that Reilly's
conduct was "egregious and reprehensible" (Defs. Ex. J)  merely
pretextual given Hearing Officer Flower's determination that
Reilly had not directed his activity at the complainant and did
not intend to intimidate her. (Defs. Ex. I)  Likewise, a
reasonable fact finder could conclude that Flipping's proffered
reason for recommending such a severe punishment, namely that
"Reilly has exhibited behavior throughout his career that
indicates racism, bigotry, sexism, lack of impartiality toward
the public, irresponsibility, bringing the department into
disrepute, failures to perform lawful duties from competent
authority as directed and failures to treat others with respect,"
(Defs. Ex. L) was pretext given the disparity between Flipping's
description of Reilly's disciplinary history and Reilly's actual
disciplinary record (Pls. Ex. I).

Reilly has also come forth with a plausible explanation for
the passage of time between the adverse employment action and the
Munoz investigation.  Friel testified that the sexual harassment
incident was Flipping's first opportunity to "get even" with

34

Reilly.  (Pls. Ex. B at 26-27)  Thus, for the same reasons we denied summary judgment on the First Amendment claim above, we also deny summary judgment on the CEPA claim.  *See Schlichtig v. Inacom Corp.,* 271 F. Supp. 2d 597, 609 (D.N.J. 2003) (A prima facie showing of causation under CEPA is established where the plaintiff produces evidence that "it is more likely than not that his statutorily protected conduct . . . was a determinative or substantial motivating factor in [the defendant's] decision to terminate his employment.") *compare with Baldassarre*, 250 F.3d at 195; *McGreevy*, 413 F.3d at 365-66 (First Amendment retaliation requires a showing that alleged retaliatory motive was a substantial motivating factor for the adverse employment action); *see also McCullough, Flipping and Snellbaker*, 137 F. Supp. 2d at 574 (denying defendants' motion for summary judgment on CEPA claim for same reasons summary judgment was denied on First Amendment retaliation claim).

We further note that unlike Reilly's § 1983 claims, Atlantic City is subject to respondeat superior liability on Reilly's CEPA claim.  *See Schlichtig,* 271 F. Supp. 2d at 716 ("the standard for employer liability under CEPA is lower than under § 1983, as New Jersey imposes respondeat superior liability upon employers.") (citing *Abbamont v. Piscataway Twp. Bd. of Ed.*, 138 N.J. 405, 420-21 (1993)).

Accordingly, we will deny Defendants' Motions for summary

judgment on the CEPA claim.

F.

Finally, Defendants assert that Reilly is not entitled to punitive damages for either his § 1983 claims against Flipping and Snellbaker individually or his CEPA claim.

To obtain punitive damages against a public official in their individual capacity, a § 1983 plaintiff need only prove "conduct [by defendants] that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Smith v. Wade*, 461 U.S. 30, 46-47 (1983). "This standard is disjunctive: 'The defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard.'" *Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006)(quoting *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989)). A reasonable fact finder could conclude that Flipping and Snellbaker acted with at least recklessness as to Reilly's First Amendment and procedural due process rights. Therefore summary judgment will be denied on the punitive damages claims against Flipping and Snellbaker individually.

We will also deny summary judgment as to punitive damages for the alleged CEPA violation. The New Jersey Supreme Court has

36

held, "'punitive damages may be awarded [against a public entity] only if the conduct of managerial or supervisory government officials is particularly egregious and involves willful indifference or actual participation.  Based on that kind of misuse of governmental authority, punitive damages serve to effectuate the goals of a statute that is specifically designed to discourage and eradicate vindictive action by employers and to further important interests of both employees and the public.'" *Green v. Jersey City Bd. of Educ.*, 177 N.J. 434, 444 (2003)(quoting *Abbamont v. Piscataway Township Bd. of Educ.*, 138 N.J. 405 (1994)).  If Reilly successfully proves his case at trial, a reasonable fact finder could find that Flipping and Snellbaker actually participated in the alleged retaliatory conduct for vindictive reasons.  Accordingly, summary judgment on punitive damages will be denied.

**IV.**

For the foregoing reasons, we will grant Defendants' Motions for Summary Judgment on the (a) § 1985(3) claim and (b) procedural due process claim against Flipping and Snellbaker in their official capacities on the ground that they are entitled to qualified immunity to the extent the claim is based on the theory that the disciplinary decision was based upon evidence not considered by Hearing Officer Flower.  To the extent Reilly's

procedural due process claim is based upon the theory that someone other than the authorized decision maker made the final determination of discipline in Reilly's case, qualified immunity for either Flipping or Snellbaker will be denied and summary judgment will be denied.   Defendants' Motions for Summary Judgment will be denied in all other respects.   The Court will issue an appropriate order.


Date: April  5th , 2006

                               s/Joseph E. Irenas
                               **JOSEPH E. IRENAS, S.U.S.D.J.**